## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD CORBETT and BRIAN FISHER, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>          v.<br><br>BANK OF AMERICA CORP., BANK OF NOVA SCOTIA, NEW YORK AGENCY, BMO CAPITAL MARKETS CORP., BNP PARIBAS SECURITIES CORP., BARCLAYS CAPITAL INC., CANTOR FITZGERALD & CO.,  CIBC WORLD MARKETS CORP., CITIGROUP GLOBAL MARKETS INC., COMMERZ MARKETS LLC, CREDIT SUISSE SECURITIES (USA) LLC, DAIWA CAPITAL MARKETS AMERICA INC., DEUTSCHE BANK SECURITIES INC., GOLDMAN, SACHS & CO., HSBC SECURITIES (USA) INC., JEFFERIES LLC, J.P. MORGAN SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MIZUHO SECURITIES USA INC., MORGAN STANLEY & CO. LLC, NOMURA SECURITIES INTERNATIONAL, INC., RBC CAPITAL MARKETS, LLC, RBS SECURITIES INC., SG AMERICAS SECURITIES, LLC, TD SECURITIES (USA) LLC, UBS SECURITIES LLC, and JOHN DOES 1-50,<br><br>          Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE ..............................................................................................4

THE PARTIES..........................................................................................................................6

    I.      PLAINTIFFS ............................................................................................................6

    II.     DEFENDANTS ..........................................................................................................6

         A.      Bank of America Corporation......................................................................6

         B.      Bank of Nova Scotia, New York Agency ...................................................6

         C.      BMO Capital Markets Corp.........................................................................7

         D.      BNP Paribas Securities Corp.......................................................................7

         E.      Barclays Capital Inc....................................................................................7

         F.      CIBC World Markets Corp..........................................................................7

         G.      Cantor Fitzgerald & Co................................................................................8

         H.      Citigroup Global Markets Inc......................................................................8

         I.      Commerz Markets LLC ...............................................................................8

         J.      Credit Suisse Securities (USA) LLC ..........................................................8

         K.      Daiwa Capital Markets America Inc............................................................9

         L.      Deutsche Bank Securities Inc......................................................................9

         M.      Goldman, Sachs & Co..................................................................................9

         N.      HSBC Securities (USA) Inc......................................................................10

         O.      Jefferies LLC ............................................................................................10

         P.      J.P. Morgan Securities LLC......................................................................10

         Q.      Merrill Lynch, Pierce, Fenner & Smith Incorporated..............................11

         R.      Mizuho Securities USA Inc. ......................................................................11

         S.      Morgan Stanley & Co. LLC.......................................................................11

T.     Nomura Securities International Inc. ...................................................... 12

U.     RBC Capital Markets, LLC ................................................................... 12

V.     RBS Securities Inc. ............................................................................... 12

W.     SG Americas Securities, LLC ............................................................... 13

X.     TD Securities (USA) LLC ..................................................................... 13

Y.     UBS Securities LLC .............................................................................. 13

Z.     The John Doe Defendants ...................................................................... 14

AA.     Agents and Unnamed Co-Conspirators ................................................ 14

OVERVIEW OF THE U.S. TREASURES MARKET ...........................................................14

I.     Background on Treasury Securities ........................................................14

II.     The Treasury Auction Process ...............................................................17

A.     An Overview of the Treasury Auction Process ...................................... 17

B.     Participants in the Treasury Auctions .................................................... 18

C.     Pre-Auction:  The "When-Issued" Market ............................................ 19

D.     The Mechanics of the Treasury Auction Process ................................... 20

E.     Post-Auction:  The Secondary Market.................................................... 23

III.     The Treasury Futures Market.................................................................24

IV.     Primary Dealers' Unique Position in the Treasury Markets.................................28

V.     The Absence of Regulation of the Treasury Securities Markets Enabled Collusive Behavior to Take Root.................................................................32

EVIDENCE OF DEFENDANTS' COLLUSIVE MANIPULATION ........................................35

I.     Defendants Intentionally Manipulated the Prices of Treasury Securities Prior to Treasury Auctions.......................................................................35

A.     Reports of Defendants' Collusive Manipulation of Treasury Prices Emerge in June 2015.............................................................................. 36

B.     Government Investigations Into Manipulation of Benchmarks and Prices in the Over-the-Counter and Futures Markets .......................................... 37

C.       An Overview of Defendants' Manipulation of the Cash Treasury
         Securities Market ........................................................................ 38

II.       Defendants Intentionally Manipulated the Prices of U.S. Treasury Futures .........39

A.       Treasury Futures Prices are Inextricably Linked to the Prices of
         Treasury Securities.................................................................... 39

B.       Expert Analysis Confirms that Defendants' Manipulated Treasury
         Futures Prices Prior to Auctions for Treasury Securities......................... 41

C.       Graphic Description of Plaintiffs' Consulting Expert's Analysis
         Demonstrates Defendants' Manipulation of Treasury Futures Prices ...... 42

III.      The Relevant Market........................................................................55

IV.       Defendants were and are Horizontal Competitors in the Market for
          Treasury Securities and Exchange-Traded Treasury Futures and Options
          on Treasury Futures ........................................................................55

V.        Plaintiffs and Class Members were Injured by the Defendants'
          Anticompetitive Conduct ..................................................................57

VI.       Class Action Allegations...................................................................58

VII.      The Discovery Rule and Fraudulent Concealment .................................61

FIRST CLAIM FOR RELIEF ........................................................................64

SECOND CLAIM FOR RELIEF ....................................................................65

THIRD CLAIM FOR RELIEF .......................................................................66

FOURTH CLAIM FOR RELIEF ...................................................................66

FIFTH CLAIM FOR RELIEF ........................................................................69

PRAYER FOR RELIEF ...............................................................................71

DEMAND FOR JURY TRIAL ......................................................................72

Plaintiffs Richard Corbett and Brian Fisher, individually and on behalf of themselves and all those similarly situated, as defined below, bring this class action for treble damages and allege as follows:

## NATURE OF THE ACTION

1.     To raise capital to operate the federal government and finance the public debt, the U.S. Treasury sells marketable securities in the form of bills, notes and bonds to institutional and individual investors through investment companies and banks at public auctions.  Total debt of the United States Treasury amounted to $18.15 trillion on June 30, 2015, including $12.5 trillion of marketable securities held by private investors.  The Treasury bills, notes and bonds are referred to as marketable securities because after sold in auctions, they generally are bought and sold in the secondary market at prevailing prices from dealers in government securities.

2.     During the period January 1, 2005 through and including June 7, 2015 (the "Class Period"), the U.S. Treasury sold approximately $70 trillion in marketable securities – bills, notes and bonds – at auction.  In a Treasury auction, certain entities are allowed to submit bids directly to the Treasury or Federal Reserve.  Direct bidders include a select group of banks known as "Primary Dealers", which are the largest group of buyers at auction, as well as other brokers and dealers (non-primary) and various types of private and government investment funds.  Primary Dealers are banks and broker-dealers specifically designated by the Federal Reserve Bank of New York as trading counterparties in U.S. government securities.  The Primary Dealers' role includes the obligation to provide the New York Fed's trading desk with market information and analysis helpful to formulate and implement monetary policy, and also carries a requirement to participate in all U.S. Treasury auctions.  Each of the Defendants was one of the privileged insiders designated as Primary Dealers and participated in all Treasury auctions during the Class Period.

3.    Treasury auctions occur regularly and have a set published schedule.   The Treasury bills, notes and bonds are short-term ("Treasury Securities"), intermediate term and long-term debt instruments, with maturities ranging from less than one year, two to ten years and thirty years, respectively.   During the Class Period, Defendants, through their unique access and position as Primary Dealers, gamed the Treasury auctions by using inside information about bids for Treasury Securities ahead of auctions first to inflate artificially and then to suppress artificially the price of the Treasury Securities sold at auction.   The same Treasury Securities that were sold at auction then sold the same day immediately after auction in the secondary market at consistently lower yield and much higher prices.   This positioned Defendants to profit from selling short large quantities of to-be auctioned Treasury Securities, prior to the close of auctions, and then covering their shorts in the aftermath of the auction results.

4.    By manipulating the market for Treasury Securities, as well as yields and prices in the auction and secondary markets for Treasury Securities, Defendants also manipulated the markets for derivatives linked to Treasury Securities, including Treasury Futures and options on Treasury Futures (collectively, "Treasury Futures").   That is because the prices of Treasury Futures are inextricably linked to the prices of Treasury Securities – to manipulate Treasury Securities prices is to manipulate Treasury Futures prices, and vice versa.

5.    Consequently, on auction days, expert analysis confirmed that Treasury Futures prices are steadily (and artificially) inflated for a period of time when trading in the pits and high-volume electronic trading commences, and then Treasury Futures prices drop precipitously (and artificially) in the hours immediately preceding the auction.   Following the close of competitive bidding for Treasury Securities at 1 p.m. (Eastern), the price of Treasury Futures

dramatically reverse course and bounce back to prices comparable to non-auction days.  These manipulations harmed traders, including plaintiffs, in the Treasury Futures market.

6.      Treasury Futures trade primarily on the Chicago Mercantile Exchange ("CME") Globex platform and are among the most liquid contracts in the world.  During the Class Period, the notional value of 2-Year, 5-Year, 10-Year, 30-Year and Ultra T-Bond Treasury Futures contract traded on the CME exceeded $369 trillion.  Treasury Futures provide a wide variety of market participants around the world the ability to manage their interest rate exposure and speculate on interest rate movements.  Treasury Futures also provide a means by which Primary Dealers and other dealers can hedge their positions in the cash Treasury market.  Therefore, their contemporaneous manipulation of the auction prices from Treasury Securities similarly positioned Defendants to benefit from the same manipulation in the Treasury Futures market.

7.      Treasury Securities and futures prices move in the same direction.  That is why futures markets are used to hedge price exposure.  Pricing trends in the cash Treasury market directly affect Treasury Futures.  Treasury Futures and related exchange-based derivatives traders, like Plaintiffs, rely on the prices published at Treasury auctions for price discovery and for assessing price and interest rate risks in the Treasury market.  An increase or decrease in the price published at auction signals either stronger demand or weakened supply, and futures traders take account of both price movements and changes in the auction when conducting their futures trading.

8.      As detailed herein, including through statistical analysis, Defendants conduct caused artificial prices in Treasury Futures, throughout the Class Period, and otherwise harmed the legitimate forces of supply and demand in the Treasury market and related on-exchange market.  This statistical evidence is original and has not been presented before in any court or

public forum.  The statistical evidence also shows that Defendants' manipulation of the Treasury markets stopped with the onset of investigations into the market in 2015.

9.      Plaintiffs are traders of Treasury Futures and other exchange-based derivatives tied to Treasury Securities.  They are best situated to bring claims on behalf of other traders of Treasury Futures and other exchange-based derivatives.  The claims asserted by these traders include various claims under the Commodity Exchange Act, which specifically prohibits manipulation that harms exchange-traders, as well as a federal antitrust claim.

10.     Plaintiffs and other members of the Class were deprived of trading in a lawful, competitive market for Treasury Futures during the Class Period and have been injured in their businesses and property.  Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiffs' counsel.  That investigation included reviewing and analyzing information concerning Defendants and Treasury Securities and Futures, which Plaintiffs (through their counsel) obtained from, among other sources:  (1) reports on the cash Treasury market; (2) pricing data for Treasury Futures; (3) pricing data for the cash Treasury auction; (4) analyses by consulting experts engaged by Plaintiffs; (6) publicly available press releases, news articles, and other media reports related to investigations into manipulation of the Treasury market; and (7) filings Defendants made to the U.S. Securities and Exchange Commission ("SEC") and other public reports about Defendants.

## JURISDICTION AND VENUE

11.     This action arises under Section 22 of the CEA, 7 U.S.C. § 25; Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, respectively.

12. This Court has jurisdiction pursuant to Section 22 of the CEA, 7 U.S.C. § 25; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26(a); and 28 U.S.C. §§ 1331 and 1337.

13. This Court has personal jurisdiction over the Defendants, as each Defendant transacted business, commerce and trading in the U.S. and in this District, during the periods of price manipulation alleged herein.  Each Defendant also has substantial contacts with the U.S., including in this District, and engaged in multiple acts in furtherance of its conspiracy in the U.S., including in this District.

14. Venue is proper in the Southern District of New York, pursuant to, among other statutes, Section 22 of the CEA, 7 U.S.C. § 25(c), 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c) and (d).  Defendants each transacted business in and had agents in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants were subject to the laws and regulations of the U.S. and its agencies, and their employees and agents entered into unlawful acts and agreements in furtherance of their market manipulation and restraint of trade in the U.S. and caused substantial effects in the U.S.

15. Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, in connection with the unlawful acts and practices and courses of business alleged in this Complaint.  Treasury futures and options contracts are commodities that trade in interstate commerce in the U.S.  Defendants are all sophisticated Treasury dealers and market participants that knew that the prices of Treasury Securities are disseminated in the U.S. and are directly and immediately incorporated into the trading and settlement prices of Treasury Futures created and traded on exchanges in the U.S.

## THE PARTIES

### I.   PLAINTIFFS

16.   Plaintiff Richard Corbett ("Corbett") was at all relevant times a Nevada resident and he transacted in Treasury Futures during the Class Period, including purchases and sales of futures contracts on the CME, including on dates of Treasury Auctions.

17.   Plaintiff Brian Fisher ("Fisher") was at all relevant times an Illinois resident and he transacted in Treasury Futures during the Class Period, including purchases and sales of futures contracts on the CME, including on dates of Treasury Auctions.

### II.   DEFENDANTS

#### A.   Bank of America Corporation

18.   Defendant Bank of America Corporation ("BofA") is the successor in interest to Defendant Countrywide Securities Corporation ("Countrywide"), which was a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures, until it was removed from the list of Primary Dealers in July 2008 when BofA acquired Countrywide and its affiliates in a de facto merger, BofA is a Delaware corporation with offices in New York, New York.

#### B.   Bank of Nova Scotia, New York Agency

19.   Defendant Bank of Nova Scotia, New York Agency ("Bank of Nova Scotia") is an uninsured state agency of The Bank of Nova Scotia, and its principal place of business is located at 250 Vesey Street, New York, New York 10080.  During the Class Period, Bank of Nova Scotia served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### C.   BMO Capital Markets Corp.

20.     Defendant BMO Capital Markets Corp. ("BMO") is a Delaware corporation and its principal place of business is located at 3 Times Square, 28th Floor, New York, New York 10036.  BMO operates as a subsidiary of BMO Financial Corp.  During the Class Period, BMO served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### D.   BNP Paribas Securities Corp.

21.     Defendant BNP Paribas Securities Corp. ("BNP") is a Delaware corporation and its principal place of business is located at 745 Seventh Avenue, New York, New York 10019. BNP operates as a subsidiary of BNP Paribas North America Inc.  During the Class Period, BNP served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### E.   Barclays Capital Inc.

22.     Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation and its principal place of business is located at 745 Seventh Avenue, New York, New York 10019. Barclays operates as a subsidiary of Barclays Group US, Inc.  During the Class Period, Barclays served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### F.   CIBC World Markets Corp.

23.     Defendant CIBC World Markets Corp. ("CIBC") is a Delaware corporation with its principal place of business located at 425 Lexington Avenue, New York, New York 10017. CIBC was a Primary Dealer until it withdrew from the list of Primary Dealers in February 2007, and CIBC at all relevant times transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### G.    Cantor Fitzgerald & Co.

24.    Defendant Cantor Fitzgerald & Co. ("Cantor") is a general partnership organized under the laws of the State of New York, and its principal place of business is located at 499 Park Avenue, New York, New York 10022.  Cantor operates as a subsidiary of Cantor Fitzgerald LP.  During the Class Period, Cantor served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### H.    Citigroup Global Markets Inc.

25.    Defendant Citigroup Global Markets Inc. ("Citigroup") is a New York corporation and its principal place of business is located at 390-388 Greenwich Street, New York, New York 10013.  Citigroup operates as a subsidiary of Citigroup Financial Products Inc. During the Class Period, Citigroup served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### I.    Commerz Markets LLC

26.    Defendant Commerz Markets LLC, formerly known as Dresdner Kleinwort Securities LLC ("Commerz"), is a Delaware corporation and its principal place of business is located at 2 World Financial Center, New York, New York, 10281.  During the Class Period, Commerz, under its former name, served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### J.    Credit Suisse Securities (USA) LLC

27.    Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware company and its principal place of business is located at 11 Madison Avenue, 24th Floor, New

York, New York 10010.  Credit Suisse operates as a subsidiary of Credit Suisse (USA) Inc. During the Class Period, Credit Suisse served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### K.    Daiwa Capital Markets America Inc.

28.    Defendant Daiwa Capital Markets America Inc. ("Daiwa") is a New York corporation and its principal place of business is located at Financial Square, 32 Old Slip, New York, New York 10005.  Daiwa operates as a subsidiary of Daiwa Capital Markets America Holdings Inc.  During the Class Period, Daiwa served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### L.    Deutsche Bank Securities Inc.

29.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a Delaware corporation and its principal place of business is located at 60 Wall Street, 4th Floor, New York, New York 10005.  Deutsche Bank operates as a subsidiary of DB U.S. Financial Markets Holding Corporation.  During the Class Period, Deutsche Bank served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### M.    Goldman, Sachs & Co.

30.    Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a New York corporation and its principal place of business is located at 200 West Street, 29th Floor, New York, New York 10282.  Goldman Sachs operates as a subsidiary of The Goldman Sachs Group, Inc. During the Class Period, Goldman Sachs served as a Primary Dealer of U.S. Treasury Securities

and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

**N.    HSBC Securities (USA) Inc.**

31.    Defendant HSBC Securities (USA) Inc. ("HSBC") is a Delaware corporation and its principal place of business is located at HSBC Tower, 452 Fifth Avenue New York, New York 10018.  HSBC operates as a subsidiary of HSBC Investments (North America) Inc.  During the Class Period, HSBC served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

**O.    Jefferies LLC**

32.    Defendant Jefferies LLC ("Jefferies") is a Delaware company and its principal place of business is located at 520 Madison Avenue, 10th Floor, New York, New York 10022.  Jefferies operates as a subsidiary of Jefferies Group LLC.  During the Class Period, Jefferies served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

**P.    J.P. Morgan Securities LLC**

33.    Defendant J.P. Morgan Securities LLC ("JPMorgan") is a Delaware company and its principal place of business is located at 277 Park Avenue, New York, New York 10172.  JPMorgan operates as a subsidiary of JPMorgan Chase & Co.  During the Class Period, JPMorgan, including its predecessors, J.P. Morgan Securities, Inc. and Bear Stearns & Co. Inc., served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

**Q.     Merrill Lynch, Pierce, Fenner & Smith Incorporated**

34.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch")
is a Delaware corporation and its principal place of business is located at One Bryant Park, New
York, New York 10036.  Merrill Lynch operates as a subsidiary of BAC North America Holding
Company.  During the Class Period, Merrill Lynch, including its predecessors in interest Merrill
Lynch Government Securities Inc. and Banc of America Securities LLC ("BofA Securities"),
served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities
and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

**R.     Mizuho Securities USA Inc.**

35.     Defendant Mizuho Securities USA Inc. ("Mizuho") is a Delaware corporation and
its principal place of business is located at 320 Park Avenue, 12th Floor, New York, New York
10022.  Mizuho operates as a subsidiary of Mizuho Securities Co, Ltd.  During the Class Period,
Mizuho served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury
Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

**S.     Morgan Stanley & Co. LLC**

36.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware
company and its principal place of business is located at 1585 Broadway, New York, New York
10036.  Morgan Stanley operates as a subsidiary of Morgan Stanley Domestic Holdings, Inc.
During the Class Period, Morgan Stanley, including its predecessor in interest, Morgan Stanley
& Co. Incorporated, served as a Primary Dealer of U.S. Treasury Securities and transacted in
U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury
Futures.

11

### T.    Nomura Securities International Inc.

37.    Defendant Nomura Securities International, Inc. ("Nomura") is a New York corporation and its principal place of business is located at 309 West 49th Street, Worldwide Plaza, New York, New York 10019.   Nomura operates as a subsidiary of Nomura Holding America, Inc.   During the Class Period, Nomura served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### U.    RBC Capital Markets, LLC

38.    Defendant RBC Capital Markets, LLC ("RBC") is a Canadian financial services company with its principal place of business at Royal Bank Plaza, 200 Bay Street, Toronto, Ontario, Canada ON M5J 2W7.   RBC also maintains offices at 3 World Financial Center, 200 Vesey Street, 8th Floor, New York, New York 10281 and at One Liberty Plaza, 165 Broadway, New York, New York 10006.   RBC operates as a subsidiary of RBC USA Holdco Corporation. During the Class Period, RBC served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### V.    RBS Securities Inc.

39.    Defendant RBS Securities Inc. ("RBS") is a Delaware corporation and its principal place of business is located at 600 Washington Boulevard, Stamford, Connecticut 06901.   RBS operates as a subsidiary of RBS Holdings USA Inc.   During the Class Period, RBS served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### W.  SG Americas Securities, LLC

40.     Defendant SG Americas Securities, LLC ("SG Americas") is a Delaware company and its principal place of business is located at 1221 Avenue of the Americas, 6th Floor, New York, New York 10020.  SG operates as a subsidiary of SG Americas Securities Holdings, which itself is a subsidiary of Société Générale Group.  During the Class Period, SG Americas served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### X.  TD Securities (USA) LLC

41.     Defendant TD Securities (USA) LLC ("TD Securities") is a Delaware company and its principal place of business is located at 31 West 52nd Street, New York, New York 10019.  TD Securities operates as a subsidiary of TD Holdings II Inc.  During the Class Period, TD Securities served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

### Y.  UBS Securities LLC

42.     Defendant UBS Securities LLC ("UBS") is a Delaware company and its principal place of business is located at 677 Washington Boulevard, New York, New York 06901.  UBS operates as a subsidiary of UBS Americas Inc.  During the Class Period, UBS served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Securities and/or U.S. Treasury-Based Instruments, including U.S. Treasury Futures.

43.     Bank of Nova Scotia, BofA, Barclays, BMO, BNP, Cantor, CIBC, Citigroup, Commerz, Credit Suisse, Daiwa, Deutsche Bank, Goldman Sachs, HSBC, Jefferies, JPMorgan, Merrill Lynch, Mizuho, Morgan Stanley, Nomura, RBC, RBS, SG Americas, TD Securities, and UBS are collectively referred to herein as "Defendants" or "Primary Dealers."

**Z.      The John Doe Defendants**

44.      Defendants John Doe 1-50 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly inappropriately influenced or attempted to influence the trading and price of Treasury Securities or related derivative instruments, including U.S. Treasury Futures.  The defined term "Defendants" also includes John Doe Defendants.

**AA.      Agents and Unnamed Co-Conspirators**

45.      During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the conspiracy by trading U.S. Treasury Securities and/or Treasury-Based Instruments, including U.S. Treasury Futures, at manipulated prices not reflecting fundamental supply and demand, to the direct benefit of Defendants.  The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents and employees.

46.      Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

47.      Each of the Defendants named herein acted as the agent of, or participated in a joint venture, for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## OVERVIEW OF THE U.S. TREASURIES MARKET

**I.      Background on Treasury Securities**

48.      The U.S. Treasury market is the deepest and most liquid government securities market in the world and the role of Treasury Securities in the global economy cannot be understated.  Treasury Securities serve as the primary means of financing for the federal

14

government, are a significant investment instrument and hedging vehicle for global investors, operate as a risk-free benchmark for other financial instruments and provide the Federal Reserve with a critical tool for implementing U.S. monetary policy.

49.     Indeed, as of June 2015, two-thirds of the U.S. Government's debt, or approximately $12.5 trillion is held in Treasury Securities, including bills, notes, bonds, Treasury Inflated Protected Securities ("TIPS") and Floating-Rate Notes ("FRNs").  On any given day, approximately $500 billion in Treasury Securities change hands.[1]

50.     There are several different types of Treasury Securities, often differing in duration and payment schedules.  Examples include the following:

51.     *Treasury bills* ("T-bills") are Treasury securities that mature in less than a year and are typically issued in 4-, 13-, 26- and 52-week maturities.  T-Bills are typically sold at a discount from the par amount (also called face value).  For instance, one might pay $990 for a $1,000 bill.  When the T-bill matures, he/she would be paid $1,000.  The difference between the purchase price and face value is interest.  It is possible for a T-bill auction to result in a price equal to par, which means that the Treasury will issue and redeem the securities at par value.

52.     *Cash Management Bills* ("CMBS") are the most flexible instrument at the U.S. Treasury's disposal because they can be issued when needed and at maturities ranging from a few days to months, allowing the Treasury to have lower cash balances and issue fewer long-term notes.  CMBs tend to pay higher yields than bills with fixed maturities, but their shorter maturities lead to lower overall interest expense.  Such bonds are typically awarded to primary dealers.

---

[1] *See* https://www.sifma.org/uploadedfiles/research/statistics/statisticsfiles/ta-us-treasury-trading-volume-sifma.xls.

53.     *Treasury notes* ("T-Notes") earn a fixed rate of interest every six months until maturity.  T-Notes are issued in terms of 2, 3, 5, 7 and 10 years, and pay interest every six months until maturity.  At maturity, the face value of a T-note is paid to the owner.

54.     *Treasury bonds* ("T-Bonds") are issued in a term of 30 years and pay a fixed rate of interest every six months until they mature.  At maturity, the face value of a T-note is paid to the owner.

55.     *Treasury Inflation-Protected Securities* ("TIPS") are issued in 5-, 10- and 30-year maturities and are designed to provide protection against inflation.  The principal of a TIPS increases with inflation and decreases with deflation, as measured by the Consumer Price Index.  TIPS pay interest biannually at a fixed rate.  The rate is applied to the adjusted principal; so, like the principal, interest payments rise with inflation and fall with deflation.  When a TIPS matures, holders are paid the greater of adjusted principal or original principal.

56.     *Floating Rate Notes* ("FRNs"), which were first issued in January 2014, are issued for a term of two years and pay varying amounts of interest quarterly until maturity.  Interest payments rise and fall based on discount rates in auctions of 13-week Treasury bills.

57.     In total, the notional value of Treasury Securities outstanding has exploded over the past ten years, growing from approximately $4.5 trillion at the end of 2004 to approximately $12.5 trillion by the end of 2014.[2]

---

[2] *See* http://www.sifma.org/uploadedfiles/research/statistics/statisticsfiles/ta-us-treasury-sifma.xls?n=31406.

| U.S. Treasury Securities Outstanding ($ in Billions) Source: SIFMA | | | | | | |
|---|---|---|---|---|---|---|
| Year | Bills | Notes | Bonds | TIPS | FRN | Total |
| 2004 | 1,001.20 | 2,157.10 | 539.40 | 245.90 | - | 3,943.60 |
| 2005 | 960.70 | 2,360.20 | 516.40 | 328.60 | - | 4,165.90 |
| 2006 | 940.80 | 2,440.50 | 530.50 | 411.10 | - | 4,322.90 |
| 2007 | 999.50 | 2,487.40 | 558.40 | 471.40 | - | 4,516.70 |
| 2008 | 1,861.19 | 2,791.51 | 591.87 | 529.62 | - | 5,774.19 |
| 2009 | 1,793.48 | 4,181.11 | 717.93 | 568.06 | - | 7,260.57 |
| 2010 | 1,772.53 | 5,571.75 | 892.64 | 616.11 | - | 8,853.02 |
| 2011 | 1,520.52 | 6,605.06 | 1,064.11 | 738.76 | - | 9,928.44 |
| 2012 | 1,628.97 | 7,327.12 | 1,240.16 | 849.84 | - | 11,046.09 |
| 2013 | 1,591.95 | 7,881.73 | 1,408.15 | 972.60 | - | 11,854.44 |
| 2014 | 1,457.89 | 8,229.19 | 1,576.17 | 1,077.55 | 163.99 | 12,504.78 |

58.     In addition to these Treasury Securities, a variety of Treasury derivative products exist.  These Treasury Instruments are linked to a particular underlying Treasury security.  As described in greater detail herein (*see* Section III, *infra*), Treasury Futures and options on Treasury Futures (previously defined as "Treasury Futures") are tied to many Treasury Securities and are traded on the Chicago Mercantile Exchange.  Treasury Futures are exchange-traded derivative contracts that are priced based upon a specific Treasury security and obligate a buyer or seller to buy or sell that underlying Treasury security at a predetermined date and price in the future.  An option on Treasury Futures provides that the holder can enter into a specified futures contract with respect to Treasury Securities.  The prices of Treasury Futures and options on Treasury Securities are directly linked to the prices of the underlying Treasury security.  *See* Section III, *infra*.

## II.     The Treasury Auction Process

### A.     An Overview of the Treasury Auction Process

59.     Since 1929, the Treasury Department has held auctions for Treasury Securities to finance the debt of the U.S. government.  While the specific details vary based on the type of

Treasury Security up for auction, Treasury Securities auctions are conducted regularly and predictably. The U.S. Treasury typically announces an auction at least several days in advance, along with the amount of Treasury Securities up for auction, the issue or original issuance date, the maturity date, the terms and conditions of the offering, the customers eligible to participate, noncompetitive and competitive bidding time and other relevant information.

60.    Auctions for the various types of Treasury Securities are generally held at regular intervals according to the following schedule:[3]

| Treasury Security | Frequency of Offering |
| --- | --- |
| 4-week bills | Weekly (Tuesdays) |
| 13-week and 26-week bills | Weekly (Mondays) |
| 52-week bills | Every 4 weeks (Tuesdays) |
| 2-year notes | Monthly (End of month) |
| 3-year notes | Monthly (Middle of month) |
| 5-year notes | Monthly (End of month) |
| 7-year notes | Monthly (End of month) |
| 10-year notes | Monthly (Middle of month) |
| 30-year bonds | Monthly (Middle of month) |
| 5-year TIPS | Three times per year (Apr, Aug, Dec) |
| 10-year TIPS | Bimonthly (Jan, Mar, May, Jul, Sep, Nov) |
| 30-year TIPS | Three times per year (Feb, Jun, Oct) |
| 2-year FRN | Monthly (End of month) |

**B.    Participants in the Treasury Auctions**

61.    Three categories of competitive participants define the Treasury auction market: i) primary dealers, ii) direct dealers and iii) indirect bidders. As explained in greater detail herein, *primary dealers* are the greatest participants in Treasury auctions and are required to bid in each Treasury auction. There are 22 designated primary dealers that can submit bids on behalf of others (*i.e.*, "indirect bidders") or for their own account (*i.e.*, "house bids"). *Direct bidders* can, but are not required to, bid directly in Treasury auctions for their own accounts, and

[3] Adapted from "Treasury Auctions", *available at*:  http://www.newyorkfed.org/aboutthefed/fedpoint/fed41.html.

historically, have done so in less volume than primary dealers.  Direct bidders include non-primary dealers, hedge funds, pension funds, mutual funds, insurers, banks, governments and individuals.  Finally, *indirect bidders* submit bids for Treasury auction through primary or direct bidders.  Indirect bidders include financial institutions, such as foreign central banks, but can also include domestic money managers making bids through primary dealers.

### C.     Pre-Auction:  The "When-Issued" Market

62.     Following the announcement of a Treasury auction, primary dealers and other market participants begin trading the new security on a "when-issued" basis.  These transactions only settle when the Treasury security is available for delivery following the auction process.  However, when-issued trading ensures that new Treasury Securities are distributed to market participants efficiently and provides price discovery information to investors prior to the auction process.   Even though when-issued trading commences immediately following the announcement of a Treasury security offering, the volume of trading increases significantly in the days immediately preceding Treasury auctions.  However, Defendants, as Primary Dealers, dominate the when-issued trading market.

63.     During the when-issued trading window, participants (including the primary dealer defendants) place, buy or sell orders with one another reflecting their expectations that Treasury Securities will either (i) fall in value, in which case a trader will "sell" or take a "short" position, or (ii) rise in value, in which case a trader will "buy" or take a "long" position.  If a trader is "long" the when-issued market, it must take delivery of the Treasury Securities at auction regardless of the result.  If a trader is "short" the when-issued market, it must cover its short position either by obtaining Treasury securities at auction or in the secondary market.  Short sellers only profit from their trades if they can obtain Treasury Securities at auction or in the secondary market at lower prices than they agreed to sell it at in the when-issued market.

19

64.     The structure of the when-issued market dictates the need for short-sellers to cover their position at no loss – primary dealers and other short-sellers are incentivized to "buy" Treasury securities at lower prices than they "sold" them in the when-issued market. Consequently, Treasury Securities in the when-issued market are typically more expensive than prices of Treasury Securities sold in the auctions.

### D.     The Mechanics of the Treasury Auction Process

65.     Bids may be submitted, as soon as an auction is announced, primarily through the Treasury Automated Auction Processing System ("TAAPS"), although a smaller volume of Treasury Securities is purchased by individual investors directly from the Treasury Department through its TreasuryDirect website.  Investors without access to either TAAPS or TreasuryDirect can bid through broker-dealers or through depository institutions that have access to TAAPS.

66.     There are two types of bids: *noncompetitive* and *competitive*.  *Noncompetitive* bids are generally submitted by small investors and individuals who agree to accept the rate, yield or discount margin that is determined at the auction.  Non-competitive bids are guaranteed to receive Treasury Securities, although the amount is limited to $5 million per auction per single bidder.  In addition, Foreign and International Monetary Authorities ("FIMA") as well as the Federal Reserve's System Open Market Account ("SOMA") may participate in auctions noncompetitively and under a separate set of rules.

67.     *Competitive bids*, by contrast, are usually submitted by large financial institutions, typically the Primary Dealers, for their own accounts or for their customers.  Unlike noncompetitive bids, competitive bids specify the rate, yield, or discount margin that the bidder will accept.  Competitive bidders are restricted to receiving no more than 35% of the total amount of Treasury Securities being auctioned to ensure that the secondary market for Treasury Securities remains competitive.  Many of the Treasury Securities bought by Primary Dealers are

later sold and resold on the secondary market to companies, banks, other dealers and individuals. Given their large bid size, Primary Dealers typically submit their competitive bids at the last possible moment – sometimes literally seconds before the auction closes (*i.e.*, at 11:30 a.m. (Eastern) for T-Bills and FRNs and at 1:00 p.m. for T-Notes, T-Bonds and TIPS).

68.     Once an auction is complete, TAAPS processes all of the bids received to determine the winning price.  The Treasury sells Treasury Securities to the public through single-price auctions, where both successful competitive and noncompetitive bidders buy securities at a price that equals the highest accepted rate, regardless of the rate or yield that they submitted. The detailed list of accepted and rejected competitive bids is not released to the public, but the total amount of bids received and total amount accepted are made available after auctions. Additionally, the high, low and median accepted rates and details on the composition of auction bidders are released to the public after auctions.

69.     Once an auction is completed, TAAPS calculates the winning rate by first subtracting noncompetitive bids from the public-offering amount to determine the amount of securities available to competitive bidders.  Because Treasury auctions are designed to minimize the cost of financing the national debt, TAAPS minimizes the winning interest rate by working its way down the list of competitive bids and accepts the total amount submitted at the lowest possible bid yields until the full offering amount has been awarded.

70.     For example, in an $11 billion auction, if $1 billion in noncompetitive bids is received, then $10 billion in Treasuries will be awarded to competitive bidders.  In this example, six separate entities submitted competitive bids into the auction at the rates below.

| Name | Yield | Amount |
|------|-------|--------|
| Bidder 1 | 2.998% | $3.5 billion |
| Bidder 2 | 2.999% | $2.5 billion |
| Bidder 3 | 3.000% | $3.0 billion |
| Bidder 4 | 3.000% | $3.0 billion |
| Bidder 5 | 3.001% | $2.0 billion |
| Bidder 6 | 3.002% | $1.0 billion |

71.     Therefore, TAAPS works its way down the list of competitive bids and accepts the total amount submitted at the lowest possible bid yields until the full offering amount has been awarded.

| | |
|------|------|
| Competitive Offering | $10,000,000,000 |
| Bidder 1 @ 2.998% (*lowest yield*) | - $3,500,000,000 |
| Remaining Competitive Offering | $6,500,000,000 |
| Bidder 2 @ 2.999% (*next lowest*) | - $2,500,000,000 |
| Remaining Competitive Offering | $4,000,000,000 |

72.     At this point, there is $4 billion remaining for competitive bidding. However, there is a total of $6 billion in bids at the next lowest rate (3.000%).  The highest accepted rate (3.000%) is known as the stop-out rate.  When this occurs, each bidder at this rate is awarded a percentage of his total bid amount.  The allocation percentage is calculated by dividing the remaining competitive offering by the total amount bid at the stop-out rate.

$$\frac{\text{Remaining Competitive Offering}}{\text{Total Bids at Stop-Out Rate (3.0\%)}} \quad = \quad \frac{\$4,000,000,000}{\$6,000,000,000} \quad = \quad 66.67\%$$

73.     In this example, only the first four bidders would receive Treasury Securities from the auction.  Bidder 1 and Bidder 2 would each be awarded in full, whereas Bidder 3 and Bidder 4 would each receive a partial allocation of $2 billion (66.67% x $3.0 billion bid).

| Name | Yield | Amt. Bid | Amt. Awarded | Allocation % | Rate Awarded |
|------|-------|----------|--------------|--------------|--------------|
| Bidder 1 | 2.998% | $3.5 billion | $3.5 billion | 100.00% | 3.00% |
| Bidder 2 | 2.999% | $2.5 billion | $2.5 billion | 100.00% | 3.00% |
| Bidder 3 | 3.000% | $3.0 billion | $2.0 billion | 66.67% | 3.00% |
| Bidder 4 | 3.000% | $3.0 billion | $2.0 billion | 66.67% | 3.00% |
| Bidder 5 | 3.001% | $2.0 billion | $0 | 0.00% | N/A |
| Bidder 6 | 3.002% | $1.0 billion | $0 | 0.00% | N/A |

22

### E.     Post-Auction:  The Secondary Market

74.     The Treasury Department releases the auction results typically within two minutes of an auction close.  A detailed list of accepted and rejected competitive bids *is not released* to the public.  Only composite information such as the total number of bids received and total amounts accepted, in addition to the high, low and median accepted rates, are publicized.  At a pre-determined date, the Federal Reserve's Fedwire Securities service delivers awarded securities to successful bidders.

75.     Post-issuance, Treasury Securities are traded in an over-the-counter secondary market.  Treasury Securities from the most recent auctions are called "on-the-run securities" whereas securities from previous auctions are called "off-the-run securities".  Trading activity takes place between primary dealers, non–primary dealers and customers of these dealers, including financial institutions, nonfinancial institutions and individuals.  Many dealers, particularly the Primary Dealers, ''make markets'' in Treasury Securities by standing ready to buy and sell securities at specified prices.  In the process of making markets, dealers purchase securities at the bid price and sell the same securities at a slightly higher price, the offer price.

76.     Through these sales and purchases, the dealer can facilitate transactions between customers while taking only temporary positions in the security.  In doing so, the dealer earns the difference between the bid and offer prices, referred to as the bid-offer spread.  In addition to transacting directly with customers, primary dealers frequently trade with one another.

77.     "Interdealer" brokers facilitate trades between dealers in the secondary market. Interdealer brokers do so by quoting the best bid and offer prices available to dealers.  For a small fee, a dealer can execute trades through an interdealer broker – either by ''hitting'' a bid price or ''taking'' an offer price.  In this structure, the interdealer brokers provide two important

services: They disseminate price and trade information efficiently and provide anonymity to market participants.

78. The secondary market for Treasury Securities is efficient. For Treasury Securities available in the secondary market, bond yields and prices respond quickly to new information affecting the fundamental value of the securities.

## III. The Treasury Futures Market

79. Treasury Futures trade on the Chicago Mercantile Exchange ("CME") Globex platform and in the trading pits. During the Class Period (January 1, 2005 through June 7, 2015), over 1.2 million futures contracts traded on average per day. The CME provides almost 24-hour access for users around the world. Like other commodity futures contracts, a Treasury Futures contract is a standardized agreement to buy or sell a commodity, such as Treasury notes or bonds, at a date in the future. Treasury Futures contracts have two sides: the "long" side, which is the buy side of the contract; and the "short" side, which is the sell side of the contract.

80. Treasury Futures are among the most liquid contracts in the world and provide a wide variety of market participants around the world the ability to manage their interest rate exposure. Market participants include asset managers, banks, corporate treasuries, hedge funds, insurance companies, mortgage bankers, pension funds and proprietary traders. Treasury Futures also are used for a variety of trading applications, including income enhancement, interest rate speculation and spread trades. Treasury Futures provide a means by which Primary Dealers and other dealers can hedge their positions in the cash market.

81. Treasury Futures historically were traded in open outcry, and the availability of the CME Globex platform enhanced the efficiency of trading Treasury Futures, with more than 90 percent of the futures now traded electronically. According to the CME, the average daily volume in Treasury Futures has been as high as 4.1 million contracts per day in February 2015.

Also during February 2015, the Treasury options volume averaged 656,000 contracts per day. The following CME graph depicts the average daily volume of Treasury Futures during 2000 through 2012:[4]



82.    Futures and options on 2-Year, 5-Year and 10-Year Treasury Notes and 30-Year Treasury Bonds are among the futures contracts available on the CME, with the 10-Year Treasury Notes Futures as the most popular and heavily traded contract.  The Long-Term "Ultra" T-Bond futures and options were introduced to the CME Treasury complex in 2010.   The following CME chart lists the specifics on the Treasury Futures: [5]

---

[4] *See* "Interest Rates:  Understanding Treasury Futures", CME Group, at 1; *available at*:
http://www.cmegroup.com/content/dam/cmegroup/education/files/understanding-treasury-futures.pdf.

[5] *See id.* at 20.

| Summary of CME Treasury Futures Contracts (Source: CME) | | | | | | |
|---|---|---|---|---|---|---|
| | **2-Year T-Note Futures** | **3-Year T-Note Futures** | **5-Year T-Note Futures** | **10-Year T-Note Futures** | **Classic T-Bond Futures** | **Ultra T-Bond Futures** |
| **Contract Size** | $200,000 face-value U.S. Treasury notes | | $100,000 face-value U.S. Treasury notes | | $100,000 face-value U.S. Treasury bonds | |
| **Delivery Grade** | T-notes with original maturity of not more than 5 years and 3 months and remaining maturity of not less than 1 year and 9 months from 1st day of delivery month but not more than 2 years from last day of delivery month | T-notes with original maturity of not more than 5-1/4 years and a remaining maturity of not more than 3 years but not less than 2 years, 9 months from last day of delivery month | T-notes with original maturity of not more than 5 years and 3 months and remaining maturity of not less than 4 years and 2 months as of 1st day of delivery month | T-notes maturing at last 6-1/2 years but not more than 10 years, from 1st day of delivery month | T-bonds with remaining maturity of at least 15 years but no more than 25 years | T-bonds with remaining maturity of at least 25 years but no more than 30 years |
| **Invoice Price** | Invoice price = settlement price x conversion factor (CF) + accrued interest, CF = price to yield 6% | | | | | |
| **Delivery Method** | Via Federal Reserve book-entry wire-transfer | | | | | |
| **Contract Months** | March quarterly cycle – March, June, September, December | | | | | |
| **Trading Hours** | Open Auction: 7:20 am- 2:00 pm, Monday- Friday; Electronic: 6:00 pm- 4:00 pm, Sunday-Friday (Central Times) | | | | | |
| **Last Trading & Delivery Day** | Last business day of contract month; delivery may occur on any day of contract month up to and including last business day of month | | | Day prior to last seven (7) business days of contract month; delivery may occur on any day of contract month up to and including last business day of month | | |
| **Price Quote** | In percent of par to one-quarter of $1/32^{nd}$ of 1% of par ($15.625 rounded up to nearest cent) | | In percent of par to one-quarter of $1/32^{nd}$ of 1% of par ($7.8125 rounded up to nearest cent) | In percent of par to one-half of $1/32^{nd}$ of 1% of par ($15.625 rounded up to nearest cent) | In percent of par to $1/32^{nd}$ of 1% of par ($31.25) | |

26

83.     Options on Treasury Futures also trade on the CME, with the underlying contract consisting of one Treasury Future.  For example, the 10-Year Treasury Note options contract has a contract size of one 10-Year Treasury Bond futures contract of a specified delivery month.  Other exchange-based contracts also are related directly to Treasury Instruments in that they have Treasury Futures as part of their structure or because they are otherwise tied to the Treasury market.  For example, intercommodity spreads between various Treasury Futures, such as OTR Treasury Futures, trade the spread between Treasury and Interest Rate Swaps futures.

84.     Interest rate swaps are agreements between counterparties to swap fixed and floating interest rates on a set notional amount for a specified time period.  The floating interest rate sometimes is based upon yields from Treasury auctions to calculate the amount of interest due.  Like Treasury Futures, the Treasury option and spread contracts are priced on the underlying Treasury notes or bonds, and the prices of the options and spread contracts also are directly correlated to and impacted by manipulation of yields and prices of Treasury Securities.

85.     Treasury futures and exchange-based derivatives traders, like Plaintiffs, rely on the prices published at auction for price discovery and for assessing price and interest rate risks in the Treasury market.  An increase or decrease in the price published at auction signals either stronger demand or weakened supply, and futures traders take account of both price movements and changes in the auction when conducting their futures trading.   Treasury Futures and exchange-based derivatives are a reflection of the conditions and expected conditions of the Treasury market.  Generally, and including during the Class Period, Treasury futures and related exchange-based derivatives prices derive their valuation from Treasury auction prices.

86.     Treasury notes, bonds and futures prices move in the same direction.  That is why futures markets are used to hedge price exposure.  Pricing trends in the cash Treasury market

directly affect Treasury futures.  The prices of Treasury Futures are directly correlated to the yields and prices of Treasury notes and bond prices.  When these high correlations or conversions are disrupted by the manipulation of prices (creating false yields/prices, *i.e.*, a manipulation of the cash Treasury Securities), the effects ripple throughout the Treasury Futures market, impacting a wide variety of derivative and futures contracts on the CME.

87.     Treasury Futures and other derivatives contract prices are directly linked to Treasury auction pricing assessments of market participants' transactions.  Therefore, reporting inaccurate or misleading Treasury auction transactional prices also results in artificial prices for the Treasury Futures contracts and other related derivative contracts.

88.     By manipulating the market for when-issued Treasury Securities, as well as yields and prices in the auction and secondary markets for Treasury Securities (as described in more detail below), Defendants also manipulated the markets for derivatives that trade to Treasury instruments, the most common of which is Treasury Futures.  These manipulations harmed traders, like Plaintiffs, in the Treasury Futures market.

## IV.  Primary Dealers' Unique Position in the Treasury Markets

89.     As described above (*see* Section I, *supra*), there are 22 primary dealers (including each of the named Defendants), though this number has historically varied over time and currently is much lower than in previous years (*e.g.*, there were 46 primary dealers in 1988).[6] Primary dealers receive this designation because they agree to serve and are designated as trading counterparties of the New York Fed in its implementation of monetary policy.  However, the relationship between the New York Fed and the Primary Dealers is a counterparty

---

[6] *See* "Primary Dealer List", Federal Reserve of New York, *available at*:  http://www.newyorkfed.org/markets/pridealers_current.html#tabs-1.

relationship, not a regulatory one, and this designation is explicitly not meant to be an endorsement of any dealers' activities.[7]

90.    Being a primary dealer carries with it certain responsibilities.  Each of these primary dealers is required to:  (i) participate consistently in open market operations to carry out U.S. monetary policy pursuant to the direction of the Federal Open Market Committee ("FOMC"); and (ii) provide the New York Fed's trading desk with market information and analysis helpful in the formulation and implementation of monetary policy.  In addition, primary dealers are expected to "bid in every auction, for, at a minimum, an amount of securities representing its pro rata share, based on the number of primary dealers at the time of the auction, of the offered amount" and those "bid prices should be reasonable when compared to the range of rates trading in the when-issued market, taking into account market volatility and other risk factors."[8]

91.    However, the primary dealer designation also provides these dealers certain economic and reputational benefits.  For example, as one Treasury market participant observed, "Typically, central banks and sovereign funds, the biggest holders of U.S. Treasuries, will only deal with primary dealers. . . . There's a certain distinction that comes with being a primary dealer."[9]  In addition, based on Primary Dealers' unique role in the Treasury auction process, these dealers are positioned to estimate order flow and demand for each issuance at a Treasury Department auction.

---

[7] *See* "Operating Policy:  Administration of Relationships with Primary Dealers", Federal Reserve of New York, Jan. 10, 2010, *available at*:  http://www.newyorkfed.org/markets/pridealers_policies.html.

[8] *See id.*

[9] D. Kruger, K. Klimasinska, and C. Salas Gage "Dealers Seek U.S. Treasury's Help in Regaining Grip on Debt", Bloomberg, Feb. 24, 2014, *available at*: http://www.bloomberg.com/news/articles/2014-02-24/bond-dealers-seek-u-s-treasury-s-help-in-regaining-grip-on-debt.

92.     In addition to having a significant presence and unique insight into the cash Treasury Securities market, Defendants trade Treasury Futures for both clients and their own accounts, in addition to using these contracts for interest rate risk management purposes.  Recent regulatory filings disclose that each Defendant had material exposure to interest rate derivatives, which Plaintiffs assert include Treasury Futures.[10]  Moreover, the recent Joint-Staff report on the Treasury markets concluded that, unlike high-frequency or proprietary trading firms, primary dealers often end trading days with open positions in Treasury Securities and Futures markets.[11]

---

[10] Consider the following:  Bank of Nova Scotia held over $206 million in exchange-traded interest rate futures as of October 31, 2014.  (*See* Scotiabank, Annual Report 2014, at 151); BMO held over C$125 million in exchange-traded interest rate futures as of October 31, 2014. (*See* BMO Financial Group, Annual Report 2014, at 150); BNP held interest rate derivatives in a total notional value exceeding €33 billion as of December 31, 2014. (*See* BNP Paribas, Registration Document and Annual Financial Report 2014, at 173); Barclays held over £82 million in interest rate derivatives as of December 31, 2014. (*See* Barclays PLC, Form 20-F 2015, at 240); CIBC held over $59 million in exchange-traded interest rate futures as of October 31, 2014. (*See* CIBC, Annual Report 2014, at 130); Citigroup held over $7 billion in interest rate futures and forwards as of December 31, 2014. (*See* Citigroup Inc., Form 10-K 2014, at 247); Commerz held over €29 million in exchange-traded interest rate futures as of December 31, 2014.  (*See* Commerzbank, Annual Report 2014, at 239); Credit Suisse held over $23 billion in interest rate futures as of December 31, 2014.  (*See* Credit Suisse, Form 20-F 2014, at 304); Daiwa held over £30 million in futures and forwards derivatives as of March 31, 2015.  (*See* Daiwa Capital Markets Europe Limited, Annual Report and financial statements for the year ended 31 March 2015, at 41); Deutsche Bank held over €4.3 billion in exchange-traded interest rate derivatives as of December 31, 2014.  (*See* Deutsche Bank Corporation, Form 20-F 2014, at 111); Goldman Sachs held over $3.1 billion in exchange-traded interest rate derivatives as of December 31, 2014.  (*See* The Goldman Sachs Group, Inc., Form 10-K 2014, at 141); HSBC held over $450 million in interest rate derivatives as of December 31, 2014.  (*See* HSBC Holdings PLC, Form 20-F 2014, at 395); Jefferies held over $2.2 million in active trader interest rate derivatives as December 31, 2014.  (*See* Deutsche Bank, Form 20-F 2014, at 111); JPMorgan held over $10 billion in interest rate futures and forwards as of December 31, 2014.  (*See* JPMorgan Chase & Co, Form 10-K 2014, at 206); Merrill Lynch held over $10 billion in interest rate futures and forwards as of December 31, 2014.  (*See* Bank of America Corporation, Form 10-K 2014, at 160); Mizuho held over ¥970 billion in interest rate derivatives as of March 31, 2014 and over ¥1 trillion in interest rate derivatives as of March 31, 2015.  (*See* Mizuho Financial Group, Inc., Form 20-F 2015, at F-73); Morgan Stanley held over $1.7 billion in exchange-traded interest rate derivatives as of December 31, 2014.  (*See* Morgan Stanley, Form 10-K 2014, at 241); Nomura held over ¥1.3 trillion in interest rate derivatives as of March 31, 2015.  (*See* Nomura Holdings, Inc., Form 20-F 2015, at 205); RBC held over C$51 million in exchange-traded interest rate derivatives as of October 31, 2013. (*See* Royal Bank of Canada, Annual Report 2014, at 156); RBS held over £4.6 billion in exchange rate derivatives as of March 31, 2015.  (*See* Royal Bank of Scotland Group PLC, Form 20-F 2014, at 205); SG Americas held over €2.3 billion in interest rate futures as of December 31, 2013. (*See* Société Générale, Consolidated Financial Statements 2014, at 102); TD Securities held over C$228 billion in exchange-traded interest rate futures as of October 31, 2014.  (*See* The Toronto-Dominion Bank, Form 40-F 2014, at 56); UBS Securities LLC held at least CHF 446 billion in exchange-traded interest rate futures as of December 31, 2014.  (*See* UBS Group AG, Form 20-F 2014, at 445).

[11] *See* Joint Report (2015) at 25 n. 20.

93.     Further benefitting from their strategic market position, several primary dealers are members of the Treasury Market Practices Group ("TMPG"), which is a group of market professionals sponsored by the New York Fed and committed to supporting the efficiency of the Treasury, agency debt and agency mortgage-backed securities ("MBS") markets.[12]   Current members of the TMPG who are employed by the primary dealers include:   the Chairperson, Thomas Wipf (Morgan Stanley); and members James DeMare (Bank of America Merrill Lynch); Beth Hammack (Goldman Sachs); Jim Hraska (Barclays Capital); Mark Tsesarsky (Citigroup Global Markets) and Sandra O'Connor (JPMorgan Chase).[13]

94.     The TMPG publishes white papers on various topics (including the impact of high frequency trading), best practices in the Treasury market and antitrust guidance, as well as meeting approximately 8 to 9 times per year.   With respect to antitrust guidance, the TMPG provides guidance on "*per se*" illegal behavior to avoid, including:   price fixing agreements; sharing price information; boycotts; and allocation of customers or territories.[14]  In addition, the TPMG provides a series of "best practices" grouped into four broad categories:   i) promoting liquidity and transparency, ii) maintaining a robust control environment, iii) managing large positions with care and iv) promoting efficient market clearing.[15]   Examples of specific best practices include the following:

- All market participants should behave in a manner that supports market liquidity and integrity.

---

[12] *See* "Treasury Market Practices Group – Charter", Feb. 26, 2015, *available at*: http://www.newyorkfed.org/TMPG/tmpg_charter_02262015.pdf.

[13] *See* "TMPG – Members", *available at*:  http://www.newyorkfed.org/TMPG/members.html.

[14] *See* TMPG, "Antitrust Guidelines for the Members of the Treasury Market Practice Group and Associated Working Groups", Feb. 26, 2015, *available at*: http://www.newyorkfed.org/TMPG/tmpg_antitrust_guidelines_02262015.pdf.

[15] TPMG, "Best Practices for Treasury, Agency Debt, and Agency Mortgage-Backed Securities Markets" revised June 2015, *available at*:  http://www.newyorkfed.org/tmpg/TPMG_June%202015_Best%20Practices.pdf.

- Market participants should be responsible in quoting prices and should promote overall price transparency across trading platforms.

- Market participants should ensure adequate oversight of their Treasury, agency debt and agency MBS trading activity.

- Each market participant should maintain a strong internal control environment sufficient to ensure that each of its business areas (front, middle, and back offices) acts in accordance with applicable laws, regulations, self-regulatory organization rules and best market practices.

- Internal control policies should further the firm's ability to detect and prevent potentially disruptive trading activity by identifying the specific trading trends, positions, strategies or behaviors within the trading operation that constitute triggers for mandatory business and compliance review.

- Market participants should avoid any strategies that create or exacerbate settlement fails.

- Market participants with large short positions should make deliveries in good faith.

- When evaluating trading strategies for large positions, market participants should take care that sudden changes in those strategies do not adversely affect the liquidity or settlement of the Treasury, agency or agency MBS issue in the marketplace.

- Market participants should be organized to ensure that the operations function is managed independently of the trading desk. Settlement and clearing staff should have reporting lines that are separate from those of the trading staff. In addition, internal controls should be in place to restrict trading staff from delaying or influencing settlement of Treasury, agency debt or agency MBS transactions.[16]

## V. The Absence of Regulation of the Treasury Securities Markets Enabled Collusive Behavior to Take Root

95.     Various regulatory agencies oversee the Treasury markets.  In particular, the

Treasury, U.S. Securities Exchange Commission ("SEC"), and federal bank regulators, including

the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the

Federal Reserve Bank of New York ("New York Fed"), and the Federal Deposit Insurance

---

[16] *Id.*

Corporation, regulate different aspects of the cash Treasury market and many of its participants.[17]   At the same time, the Commodity Futures Trading Commission ("CFTC") regulates the Treasury Futures market and its participants.[18]

96.    Even though various agencies are involved in regulating the markets for Treasury Instruments, regulators have not taken a "hard look at how Wall Street trades Treasuries" since 1998.[19]   Indeed, "[n]o single regulator in th[e] $12.[5] trillion market has the authority or expertise to assess evidence of illicit practices."[20]

97.    The explosion of electronic trading in recent years has further complicated the regulatory task.  In 1998, the trading of Treasury Instruments was still a manual exercise, but today "about half of Treasuries volume in institutional markets is done by high-frequency traders."[21]   As Craig Pirrong, a finance professor at the University of Houston observed, "The Treasury, Fed, whoever, have always taken a hands-off role with the government securities market," but "[i]t is rather remarkable that the Fed and Treasury have taken little interest in the dramatic change in market microstructure and trading technology."[22]   Similarly, a former Treasury Department responded, "No one is" when asked who ultimately is responsible for regulating the Treasury markets.[23]

98.    The shift towards electronic trading has further strengthened the relationship between the trading of cash Treasury Securities and Treasury Futures, with nearly identical

---

[17] *See* Joint Report 2015 at 1-2.

[18] *Id.*

[19] Matthew Leising, *If Treasuries are Manipulated, Good Luck Find Any Cops*, Bloomberg, Dec. 8, 2014, *available at*:   http://www.bloomberg.com/news/articles/2014-12-08/light-speed-treasury-trading-governed-by-rules-dating-to-1998.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

trading patterns emerging between the cash and physical markets.[24]   In the opinion of one financial market expert, James Cox, a Duke University Law School professor, "In the Treasury market, where you have a small number of participants and the sales volume is very high, *it is a fertile area for harmful collusive behavior.*"[25]

99.      Throughout the Class Period, Defendants exercised *de facto* control over how the market responded to technological innovation and shifts in trading patterns.   One market participant commented, "[p]rimary dealers are an *insiders club* where they're supposed to have more information," due to these dealers' outsized influence over the market.[26]   In the absence of strong regulatory oversight, Defendants attempted to capitalize on their "insider status."   As *Bloomberg* recently reported, "The open secret part of the equation is that some people at these banks can see orders flowing in – and until now there has been little public insight into whether there are others at the banks who may seek to use or share that slice of market intelligence to improve their positions in the secondary or futures markets."[27]

100.      During the Class Period, the Primary Dealers understood that they were expected to ensure that the U.S. Treasury market operated efficiently and properly.   Indeed, the TMPG, the industry group responsible for providing guidance on this market, adopted specific guidelines designed to curb potential abuses and to dissuade primary dealers from succumbing to *per se* violations of antitrust law and regulations.   These efforts were unsuccessful.   As described herein, Defendants and their co-conspirators abused the trust reposed in them by manipulating the U.S. Treasury market for their own benefit.

---

[24] *Id.*

[25] *See* A. Scaggs, D. Kruger and K. Geiger, "As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Is a Good Place to Start", Bloomberg, June 24, 2015, *available at*: http://www.bloomberg.com/news/articles/2015-06-24/trader-talk-is-an-open-secret-as-u-s-probes-treasuries (emphasis added).

[26] *Id.* (emphasis added).

[27] *Id.*

## EVIDENCE OF DEFENDANTS' COLLUSIVE MANIPULATION

**I.   Defendants Intentionally Manipulated the Prices of Treasury Securities Prior to Treasury Auctions**

101.   In recent years, commentators have suggested that the primary dealer structure effectively cedes control of the Treasury markets to 22 financial institutions and is tantamount to a "cartel" that reduces competition and increases the dealers' ability to extract profit.[28]  What one commentator found surprising "[was] that there have been so few whiffs of scandal in Treasury-bond auctions."[29]

102.   There have, of course, been historical examples of primary dealers abusing their privileged position in the Treasury auction process.  The clearest example of such abuse is the Salomon Treasury scandal of the early 1990s that resulted in Defendant Citigroup's predecessor in interest being fined $290 million for attempting to corner the market for certain Treasury Securities.[30]  Yet, in a Joint Report on the Government Securities Market issued in 1992 in the aftermath of the Salomon scandal, regulators concluded that Salomon was not the only bad actor. The report concluded, "[t]he SEC's investigation revealed that *nearly all* selling group members engaged in one or more improper practices in connection with the primary distribution of GSE securities."[31]

---

[28] *See* T. Dolan, "The Capo of Cartels", Barron's, May 18, 2009, *available at*:  http://www.barrons.com/articles/ SB124242706194525305.

[29] *Id.*

[30] *See generally*, Joint Report on the Government Securities Market (Treasury, SEC and Federal Reserve), January 22, 1992, *available at*:   http://www.treasury.gov/resource-center/fin-mkts/Documents/gsr92rpt.pdf;   DOJ   Press Release, "Department of Justice and SEC Enter $290 Million Settlement with Salomon Brothers in Treasury Securities Case", May 20, 1992, *available at:* http://www.justice.gov/archive/atr/public/press_releases/1992/ 211182.htm; *see also* S. Labaton, "Salomon to Pay Phony-Bid Fine of $290 Million", N.Y. TIMES, May 21, 1992, *available at*:  http://www.nytimes.com/1992/05/21/business/salomon-to-pay-phony-bid-fine-of-290-million.html.

[31] Joint Report 1992, at C-7 (emphasis added).

103.    Flash forward twenty-three years and it is apparent that regulators are likely to find that primary dealers have again improperly flouted their power in the market for Treasury Securities.

104.    Likewise, market participants have been accused of attempting to trade Treasury Futures and Securities simultaneously to effectuate beneficial trading positions.  In recent years, bond market giant, Pacific Investment Management Co. LLC ("PIMCO"), settled allegations that it created artificial scarcity in the June 2005 10-Year Treasury note futures contract by purchasing an outsized "long" position in both the underlying Treasury security by holding both the futures and cash position until the brink of maturity, which caused "short" sellers to cover their positions at significant losses.  *See generally*, *Hershey et al. v. Pacific Investment Management Co. LLC et al.*, No. 05 Civ. 4681 (N.D. Ill.).

105.    Based on the foregoing, it is apparent that Defendants were able to exercise manipulative control over the Treasury market, inuring benefits for themselves but to the detriment of others.

A.      **Reports of Defendants' Collusive Manipulation of Treasury Prices Emerge in June 2015**

106.    On June 8, 2015, the New York Post first reported the Department of Justice "is looking into possible fraudulent manipulation of the $12.5 trillion Treasury market."[32]  This initial report indicated that DOJ investigators began investigating the Treasury market on the heels of the agency's investigation into currency market manipulation.[33]  The report also

---

[32] *See* Kevin Dugan, "Justice Department probes banks for rigging Treasuries market", New York Post, June 8, 2015, *available at*:  http://nypost.com/2015/06/08/department-of-justice-probes-treasuries-market/.

[33] *Id.*

suggested that investigators had requested information from at least 3 out of the 22 primary dealers related to the Treasury auction process.[34]

107.    Subsequent news coverage focused on how Defendants used information obtained from customer bids in the hours before Treasury auctions to benefit their own trading positions.[35] For example, *Bloomberg* reported, "Traders at some of these dealers also have talked with counterparts at other banks via online chatrooms, according to people familiar with the operations, with one of them adding that the *traders swapped gossip about clients' Treasury orders as recently as last year*."[36]

108.    Recently, other regulators beyond the DOJ have begun to scrutinize the Treasury markets.  For example, on September 9, 2015, the *Financial Times* reported that "[t]he [New York] Department of Financial Services sent letters last  month [*i.e.*, August 2015] to Barclays, Deutsche Bank, Goldman Sachs, Société Générale and other banks seeking information about their operations related to Treasury auctions."[37]  This article again likened the regulatory probe into Treasury market abuses to other regulatory investigations into banks' manipulation of key benchmark rates.[38]

### B.    Government Investigations Into Manipulation of Benchmarks and Prices in the Over-the-Counter and Futures Markets

109.    Recent governmental and regulatory investigations, and related settlements, demonstrate that Defendants had the motive and opportunity to manipulate cash and futures markets when there was a designated group of banks and financial companies with privileged

---

[34] *Id.*

[35] *See* Scaggs, *et al.*, *supra*.

[36] *Id.* (emphasis added).

[37] G. Chon and M. Arnold, "Watchdog in US Treasury Market Probe", Financial Times, Sept. 9, 2015, *available at*: http://www.ft.com/intl/cms/s/0/fbb913c2-5650-11e5-a28b-50226830d644.html#axzz3mO0dNfnM.

[38] *See id.*

positions to report and influence benchmarks and other prices.  For example, in the foreign exchange FX markets, recent government settlements demonstrate that certain banks dubbed themselves a "cartel" and used group chat rooms to conspire and collude to share confidential client information and front run client orders for their own benefit and financial gain.

110.    The CFTC, Department of Justice and New York State Department of Financial Services have joined with authorities in the United Kingdom and other foreign countries to investigate and punish manipulation of global benchmarks such as the London Interbank Offered Rate ("LIBOR").  Transcripts of voice and instant messages revealed in the government settlements demonstrate the ease with which large financial institutions can communicate and coordinate efforts to manipulate FX and LIBOR and related futures and derivatives markets to benefit the trading desks of themselves and their affiliates.  These same motives and opportunities are present in the Treasury markets.

### C.    An Overview of Defendants' Manipulation of the Cash Treasury Securities Market

111.    Defendants sought to capitalize on their informational advantages by putting in place a trading strategy that maximized the spread between the price at which they established short positions in the when-issued market and their acquisition costs of covering the short by acquiring Treasury Securities prior to the auction, at auction, and after the auction.  Defendants engaged in this manipulation because they were required to bid, and had access to confidential client orders, in Treasury auctions.  Defendants, individually and collectively, generally maintained short positions in the when-issued market throughout the Class Period.  Thus, Defendants needed to be able to cover their short positions profitably.  To effectuate this strategy, Defendants employed three steps:

112.    *First*, Defendants attempted to artificially inflate the prices of Treasury Securities in the when-issued market by coordinating bid-ask spreads as well as buying Treasuries in the cash (*i.e.*, spot) and futures markets.  Defendants communicated with one another during the when-issued market in order to make sure that the prices of Treasury Securities would remain artificially higher than the prices would have been but for Defendants' coordination.

113.    *Second*, starting about three hours prior to the close of competitive bidding, Defendants systematically dumped their holdings of cash and futures positions and artificially suppressed Treasury Securities and Futures prices.  Defendants also coordinated their bidding at Treasury auctions to ensure that they artificially *suppress* the prices that they would pay for Treasury Securities at auction.  Suppressing the acquisition price at auction would ensure that Defendants could cover some of their when-issued short positions profitably.

114.    *Third*, Defendants continued to cover their short positions in the aftermath of the auction which allowed the Treasury prices to fully recover.

115.    In essence, Defendants' anticompetitive conduct guaranteed that they were able to keep the spread between when-issued and auction and secondary market and auction prices at supra-competitive levels that would otherwise not have been possible in a competitive market. As detailed herein (*see* Section II.B, *infra*), Defendants' conspiracy ultimately collapsed around the time news of investigations leaked in the press.

## II.    Defendants Intentionally Manipulated the Prices of U.S. Treasury Futures

### A.    Treasury Futures Prices are Inextricably Linked to the Prices of Treasury Securities

116.    The prices of Treasury Futures run in parity, or lock-step, with cash market prices for Treasury Securities, and changes in the cash market prices for Treasury Securities are immediately and correspondingly reflected in Treasury Futures prices.  Similarly, if new

information or price distortion arrives at the futures market first, this would be quickly transmitted to the spot prices. Thus, the manipulation of yields and prices in the cash Treasury market is a manipulation of the price of the commodity underlying the Treasury Futures contracts. This is because the cash market prices for Treasury Securities act just like the prices of any other commodity for the purposes of settlement and price discovery. The prices of Treasury Securities are the reference prices for Treasury Futures contracts, just as the physical price of soybeans or silver is the reference price for their respective futures contracts traded on exchange. Similarly, the manipulation of yields and prices in the futures market is also a direct manipulation of the price of the Treasury Futures contracts.

117. Indeed, the recent Joint Staff Report on the U.S. Treasury market observed: "[T]he U.S. Treasury market comprises the secondary market trading of cash Treasury securities as well as the futures and options on Treasury securities. Prices are tightly linked across these markets. . . ."[39]

118. Treasury Futures contract prices are set at the date and time such contracts are entered into, whether they are opening contracts or offsetting, closing contracts. Over the course of a trading day, Treasury Futures prices reflect and are directly tied to the corresponding cash market prices for Treasury Securities. Consequently, Defendants can manipulate Treasury prices either in the spot or futures markets or they can use both markets. Because Defendants'

---

[39] *See* Joint Staff Report of Treasury, Federal Reserve, New York Fed., SEC, and CFTC, "The U.S. Treasury Market on October 15, 2014", July 13, 2015 at 2, *available at*: http://www.treasury.gov/press-center/press-releases/Documents/Joint_Staff_Report_Treasury_10-15-2015.pdf. In addition, the recent TMPG White Paper on high-frequency trading observes that changes in the Treasury Futures market have the potential to meaningfully impact the cash Treasury Securities market. *See* TMPG, "Automated Trading in the Treasury Markets, June 2015 at 8, *available at*: http://www.newyorkfed.org/tmpg/TPMG_June%202015_automated%20trading_white%20 paper.pdf ("Given the size of the futures and interest rate swap markets and the active market for spread trading between them, changes in liquidity in the futures and interest rate swap markets have the potential to also meaningfully impact liquidity in the Treasury securities market.").

manipulation caused distortion in both spot and futures markets, any manipulation in one market would be quickly transmitted to the other market.

119.    Defendants' manipulation of prices for Treasury Securities injured Treasury Futures traders, such as Plaintiffs and the members of the Class, whose futures contract prices were affected by or set at manipulated prices.

**B.    Expert Analysis Confirms that Defendants' Manipulated Treasury Futures Prices Prior to Auctions for Treasury Securities**

120.    Plaintiffs retained the services of a Consulting Expert who performed econometric analysis of the Treasury Futures market during the Class Period.  Plaintiffs' Consulting Expert determined that pricing anomalies existed in the Treasury Futures market throughout the Class Period.  These pricing anomalies are consistent with Plaintiffs' allegations that Defendants sought to artificially suppress the prices of Treasury Securities and Treasury Futures prior to Treasury Auctions, and artificially increase the prices of Treasury Securities and Treasury Futures immediately following Treasury Auctions.

121.    More specifically, Plaintiffs' Consulting Expert determined that on Treasury Auction Days, prices of Treasury Futures were first increasingly and artificially inflated for about 1.5 to 2 hours starting with the pit trading on CME at 7:20 a.m. (Central).  Then starting about 10 a.m. (Eastern), they increasingly (and artificially) suppressed prices prior to 1:00 p.m. (Eastern) (*i.e.*, when competitive bidding in Treasury Auctions close).  However, immediately following 1:00 p.m. (Eastern) the Treasury Futures prices began to increase and fully recovered by the end of the electronic trading at 4 p.m.  None of these pricing patterns occurred consistently on non-Treasury Auction Days.  In addition, these pricing anomalies dissipated following the announcement of regulatory investigations into the Treasury markets in June 2015.

### C.     Graphic Description of Plaintiffs' Consulting Expert's Analysis Demonstrates Defendants' Manipulation of Treasury Futures Prices

122.    Visual evidence of Defendant's manipulation is provided in the following charts. To construct these charts, Treasury Futures price and volume data were obtained from January 1, 2005 to September 16, 2015.[40]  For each day, Treasury prices were then normalized using the average price for the benchmark period from 6:50 a.m. to 7:20 a.m. (Central).  The charts show the normalized Treasury returns relative to the benchmark periods from 7:20 a.m. (start of open outcry pit trading) to 4:00 p.m. (Central), when electronic trading stops on the CME.

123.    "Treasury Auction days" refers to those days when the U.S. Treasury conducted an auction of any Treasury Note or Treasury Bond.  The competitive bidding on these auction days closed 12:00 p.m. (Central), or 1:00 p.m. (Eastern).  Within a few minutes of the closing of the competitive bidding time, the results of the auction were made publicly available on U.S. Treasury's website.  All other days are referred to as "non-auction days".

124.    The Treasury Futures returns shown in the charts indicate strong evidence of manipulations.  Price patterns are shown relative to the benchmark hours during the 280 minutes prior to 1:00 p.m. (Eastern), and 300 minutes thereafter for both auction and non-auction days. For auction days, there are three distinct patterns.  *First*, starting with the pit trading, Treasury prices jump up.  The magnitude of this increase ranges from 0.2 basis points to about 2 basis points for different contracts.  This price increase is much more pronounced relative to non-auction days.  *Second*, starting around 10 a.m. (Eastern), Treasury Futures prices drop precipitously until the auction close time at 1 p.m. (Eastern).  The magnitude of the drop varies from about 0.5 basis points for the Two-Year Treasury Note Futures to about 5 basis points for Ultra T-Note Bond Futures.

---

[40] *N.B.* For the Treasury Ultra Bond Futures contract, the data starts in February 2010.

125.     Starting within a few minutes after 1:00 p.m. (Eastern) with the public announcement of the auction results, the Treasury Futures prices then retrace their steps and recover all of the lost ground.   By the time trading in Treasury Futures stops at 4:00 p.m. (Central), Treasury Futures prices are back to near where they would be on non-auction days.

126.     On non-auction days, none of these intra-day patterns of price reversals appear. Prices tend to rise at the beginning but less so than on auction days.   There is no evidence of price pressure before 1:00 p.m. (Eastern) and there is no recovery or reversal patterns after 1:00 p.m. (Eastern).   Instead, Treasury Futures prices evolve gradually throughout the day, consistent with the normal flow of fundamental information.   Interestingly total returns for auction and non-auction days appear to be approximately the same.   This evidence indicates that there were no systematically unusual news announcements on auction dates relative to non-auction days.

127.     In addition, these pricing anomalies that existed throughout the Class Period dissipated following the announcement of regulatory investigations into the Treasury markets in June 2015.

1.        **The Two-Year T Note Futures Contract**

128.    The following chart compares the pricing pattern of the Two-Year T-Note Futures Contract on both Treasury Auction and non-Treasury Auction days during the Class Period.  The chart demonstrates that on auction days prices of the Two-Year T-Note Futures Contract are first artificially inflated and then artificially suppressed prior to 1:00 p.m. (Eastern) before rebounding immediately thereafter:



Two-Year T-Note Futures Returns around 1PM NYC Time, from 1/1/2005 to 6/7/2015

129.    The following chart compares the pricing pattern of the Two-Year T-Note Futures Contract on both Treasury Auction and non-Treasury Auction days after news of the DOJ investigation into the Treasury markets broke on June 8, 2015.  This chart demonstrates that the pricing pattern of the prior chart disappeared once the investigations became public.  For auction days, Treasury prices decline first at the start of trading and then increase, which is the opposite of the pattern for the Class Period:



Two-Year T-Note Futures Returns around 1PM NYC Time, Post 6/7/2015

2.      **The Five-Year T-Note Futures Contract**

130.    The following chart compares the pricing pattern of the Five-Year T-Note Futures

Contract on both Treasury Auction and non-Treasury Auction days during the Class Period.  The

chart demonstrates that on auction days prices of the Five-Year T-Note Futures Contract are first

artificially inflated and then artificially suppressed prior to 1:00 p.m. (Eastern) before rebounding

immediately thereafter:



Five-Year T-Note Futures Returns around 1PM NYC Time, from 1/1/2005 to 6/7/2015

131.   The following chart compares the pricing pattern of the Five-Year T-Note Futures Contract on both Treasury Auction and non-Treasury Auction days after news of the DOJ investigation into the Treasury markets broke on June 8, 2015.  This chart demonstrates that the pricing pattern of the prior chart disappeared once the investigations became public.  For auction days, Treasury prices decline first at the start of trading and then increase, which is the opposite of the pattern for the Class Period:



### 3.    The Ten-Year T-Note Futures Contract

132.    The following chart compares the pricing pattern of the Ten-Year T-Note Futures Contract on both Treasury Auction and non-Treasury Auction days during the Class Period.  The chart demonstrates that on auction days prices of the Ten-Year T-Note Futures Contract are first artificially inflated and then artificially suppressed prior to 1:00 p.m. (Eastern) before rebounding immediately thereafter:



Ten-Year T-Note Futures Returns around 1PM NYC Time, from 1/1/2005 to 6/7/2015

133.   The following chart compares the pricing pattern of the Ten-Year T-Note Futures Contract on both Treasury Auction and non-Treasury Auction days after news of the DOJ investigation into the Treasury markets broke on June 8, 2015.  This chart demonstrates that the pricing pattern of the prior chart disappeared once the investigations became public.  For auction days, Treasury prices decline first at the start of trading and then increase, which is the opposite of the pattern for the Class Period:



Ten-Year T-Note Futures Returns around 1PM NYC Time, Post 6/7/2015

### 4.     The Thirty-Year T-Bond Futures Contract

134.     The following chart compares the pricing pattern of the Thirty-Year T-Bond Futures Contract on both Treasury Auction and non-Treasury Auction days during the Class Period.  The chart demonstrates that on auction days prices of the Ten-Year T-Note Futures Contract are first artificially inflated and then artificially suppressed prior to 1:00 p.m. (Eastern) before rebounding immediately thereafter:

Thirty-Year T-Bond Futures Returns around 1PM NYC Time, 1/1/2005 to 6/7/2015



50

135.    The following chart compares the pricing pattern of the Thirty-Year T-Bond Futures Contract on both Treasury Auction and non-Treasury Auction days after news of the DOJ investigation into the Treasury markets broke on June 8, 2015.  This chart demonstrates that the pricing pattern of the prior chart disappeared once the investigations became public. For auction days, Treasury prices decline first at the start of trading and then increase, which is the opposite of the pattern for the Class Period:



Thirty-Year T-Bond Futures Returns around 1PM NYC Time, Post 6/7/2015

### 5.    The Ultra T-Bond Futures Contract

136.    The following chart compares the pricing pattern of the Ultra T-Bond Futures Contract on both Treasury Auction and non-Treasury Auction days during the Class Period.  The chart demonstrates that on auction days prices of the Ultra T-Bond Futures Contract are first artificially inflated and then artificially suppressed prior to 1:00 p.m. (Eastern) before rebounding immediately thereafter:



Ultra T-Bond Futures Returns around 1PM NYC Time, from 1/1/2005 to 6/7/2015

137.    The following chart compares the pricing pattern of the Ultra T-Bond Futures Contract on both Treasury Auction and non-Treasury Auction days after news of the DOJ investigation into the Treasury markets broke on June 8, 2015.  This chart demonstrates that the pricing pattern of the prior chart disappeared once the investigations became public.  For auction days, Treasury prices decline first at the start of trading and then increase, which is the opposite of the pattern for the Class Period:



Ultra T-Bond Futures Returns around 1PM NYC Time, Post 6/7/2015

138.    The visual evidence in the above charts is consistent with manipulations of the Treasury auctions.  The evidence strongly suggests three distinct periods for auction days, i) Accumulation Period, ii) Dumping Period and iii) Recovery Period.  This evidence strongly suggests that for auction days the Defendants first inflated the prices of Treasury Securities by accumulating large inventories at the start of the trading day.  The Accumulation Period on average lasts for about 90 to 100 minutes at the beginning of the trading day.  Next, comes the Dumping Period which lasted about three hours on average, when the Defendants shorted (sold) large quantities of the to-be-auctioned securities as well as existing Treasury Futures prior to the auction close time.  This activity put downward pressure on all Treasury prices, consistent with the sharp decline in prices prior to 1:00 p.m. (Eastern).  Next is the Recovery Period, when the Defendants then covered their short positions by placing similarly large quantities of buy orders in the competitive auction to deliver against their short positions.  The Defendants then also purchased similarly large quantities of Treasury Futures in the aftermath of the auction results in order to more fully cover their short futures positions.  The stoppage of the manipulative selling activity and the accompanying buying activity then forced Treasury Futures prices to recover.  By the end of the trading day, prices completely reversed course and all of the manipulative decreases were recovered.

139.    Additional tests were undertaken to determine the statistical significance of these price patterns using regression and correlation analyses.  Both types of analyses indicate that these price patterns are not likely to be due to random events.  Instead, statistical tests indicate that these patterns are unusual and statistically significant at the usual 5% level or better.  This finding further confirms that these stark price pressure and reversal patterns cannot be attributed

to random events, which is strong evidence of manipulation in the cash and futures Treasury markets.

## III.    The Relevant Market

140.    The relevant market in this case is the market for the U.S. Treasury Securities (*i.e.*, U.S. Treasury bills, notes, bonds and related debt instruments) and the related market for exchanged-traded derivative financial instruments based on Treasury Securities, including Treasury Futures and options on Treasury Futures, which are traded on the Chicago Mercantile Exchange.

## IV.    Defendants were and are Horizontal Competitors in the Market for Treasury Securities and Exchange-Traded Treasury Futures and Options on Treasury Futures

141.    As alleged herein, Defendants dominate the market for Treasury Securities and have the power collectively to control prices in that market.  Because of the direct causal relationship between Treasury Securities cash market prices and Treasury Futures prices (*i.e.*, Treasury Futures prices respond rapidly to price changes in the cash markets for Treasury Securities), Defendants consequently have the power to control, and did control, prices in the Treasury Futures market.

142.    Defendants are, and were during the Class Period, horizontal competitors in both the market for Treasury Securities and the Treasury Futures market.  In the market for Treasury Securities, Defendants compete against each other on at least two levels.  *First*, Defendants compete against each other by bidding on Treasury Securities for their clients and/or their own proprietary accounts in the Treasury auction process.  *Second*, Defendants compete against each other as traders for their own accounts – including by seeking profits from taking net long or short positions – and to obtain the most beneficial positions at prices determined by, absent Defendants' collusion as alleged herein, competition with other traders.

143.    In the Treasury Futures market, Defendants compete against each other and other traders, as both proprietary traders seeking profits by taking net long or short positions, and also for the purposes of interest rate risk management by using futures and options to hedge interest rate exposures.  In both cases (proprietary trading and hedging), Defendants seek to obtain the most beneficial futures contracts and options at prices determined by, absent Defendants collusion as alleged herein, competition with other traders.

144.    During the Class Period, Defendants traded Treasury Securities and other related derivative contracts, including exchange-traded Treasury Futures.  By acting together, Defendants could and did control the prices of Treasury Securities in the when-issued market and at auction to benefit their and their co-conspirators' related trading positions in Treasury Securities and Treasury Futures.  Defendants' manipulation of Treasury Securities prices, as alleged herein, injures competition.  Defendants collusively manipulated in three ways.  *First*, Defendants artificially inflated the prices of Treasury securities.  Second, Defendants suppressed the prices of Treasury Securities immediately before and at auction and therefore artificially increased auction yields and discount rates generated by the auctions (as the largest group of bidders in Treasury auctions, Defendants had the power to effectuate this result).  *Third*, Defendants engaged in "front running" their clients' orders in the when-issued and secondary markets to improve their own trading positions, at the expense of Plaintiffs and Class members.

145.    This collusive, artificial manipulation of prices for Treasury Securities had an immediate, direct, substantially certain and foreseeable corresponding impact on prices of exchange-traded Treasury Futures.

146.    Such behavior is completely inapposite to what was expected of Defendants.  As the largest participants in Treasury auctions, Defendants were expected to ensure that auctions

resulted in market prices.   Likewise, Defendants were expected to compete actively in the secondary market and in the auction itself.

147.    Defendants' collusive inflation of Treasury auction yields, inflation of on-the-run/off-the-run Treasury Security yields and suppression of Treasury Futures prices had the purpose and effect of depressing prices in the market.   In addition, trade was restrained and competition decreased in the markets for Treasury Securities and Treasury Futures.   Due to the clear and obvious risk of inflicting anticompetitive impact and economic injury, Defendants' conduct constitutes a per se violation of the antitrust laws.

## V.    Plaintiffs and Class Members were Injured by the Defendants' Anticompetitive Conduct

148.    The injury suffered by Plaintiffs and other members of the Class flowed directly from Defendants' collusive manipulation of Treasury Securities in the when-issued market and at Treasury auctions.   Defendants' anticompetitive conduct had severe adverse consequences on competition, in that Defendants artificially ensured advantageous market movements in the Treasury Securities in the when-issued market and at Treasury auctions by exchanging confidential customer information and agreeing to concerted trading strategies, such as front running, banging the close and painting the screen, based on aggregate customer order flow information.   As alleged herein, no one Defendant could accomplish systematic and continuing manipulation of Treasury Securities in the when-issued market, secondary market and at Treasury auctions without coordinating with its rivals.   Absent Defendants' knowledge of one another's confidential customer information, the conduct alleged herein would be a risky strategy.   Defendants benefited from coordinating their market activities.

149.    Changes in spot market prices are immediately and correspondingly reflected in Treasury Futures prices.   Similarly, changes in the futures prices would be reflected in spot

prices.  The direct harm suffered by Plaintiffs and the members of the Class happened because

the prices of Treasury Futures contracts are tied to Treasury Securities prices in the when-issued

market and at Treasury auctions.  As a result, Defendants' collusion to fix and manipulate prices

of the Treasury Securities in the when-issued market and at Treasury auctions directly caused

Plaintiffs and members of the Class injury to their business or property, and actual damages, in

the form of diminished profits or increased losses on their exchange-traded Treasury Futures.

Such antitrust injury to Plaintiffs and Class members flowed directly from the anticompetitive

nature and effects of Defendants' collusive conduct, which replaced prices set by competition

among horizontal competitors with prices set by Defendants' collusive manipulation.

150.    The injury to Plaintiffs and members of the Class is of the type the antitrust laws

were designed to prevent and flow from that which makes Defendants' acts alleged herein

unlawful.

## VI.    Class Action Allegations

151.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of themselves and all others similarly situated.  The "Class" is defined as:

> All persons, corporations and other legal entities who purchased or
> sold U.S. Treasury Futures and options on U.S. Treasury Futures
> that are linked or otherwise tied to such bills, bonds, notes, TIPS,
> FRNS and/or other marketable securities issued by the U.S.
> Department of Treasury between January 1, 2005 through and
> including June 7, 2015 (the "Class Period").

> Excluded from the Class are the Defendants, officers, directors or
> employees of any Defendant; any entity in which any Defendant
> has a controlling interest; any affiliate, legal representative, heir,
> assign, parent, subsidiary, co-conspirator of any Defendant and the
> United States Government.

152.    Each member of the Class incurred costs, fees and/or other expenses associated

with transacting in Treasury Futures during the Class Period.  No member of the Class would

have consensually incurred the costs, fees and/or other expenses associated with such transactions, had such Class member been aware that he, she or it faced a risk of loss arising from collusive manipulation of Treasury prices by the Defendant banks that dominate the Treasury market. Therefore, each member of the Class suffered injury caused by Defendants' conduct when he, she or it incurred the costs, fees and/or other expenses associated with such transactions during the Class Period.

153. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. There are at least hundreds of individuals or entities that purchased, sold or held relevant U.S. Treasury Futures and options on U.S. Treasury Futures during the Class Period at prices artificially affected by Defendants' wrongful conduct. While the exact number and identity of Class members is unknown to Plaintiffs, this can be ascertained from readily available information.

154. There are questions of law and fact common to all Class members, including, but not limited to:

a.   whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, lower, maintain, stabilize and/or otherwise manipulate Treasury Securities and Treasury Futures prices;

b.   the nature and duration of the Defendants' manipulation of Treasury Securities and Treasury Futures prices;

c.   whether manipulation of Treasury Securities prices injected artificial prices into Treasury Futures and options on Treasury Futures that traded on the Relevant Exchange;

d.       whether Defendants participated in the markets for U.S. Treasury Futures and options for U.S. Treasury Futures;

e.       whether Defendants' conduct violated Section 22 of the CEA;

f.       whether Defendants' conduct acted to aid and abet violations of the CEA;

g.       whether Defendants combined, agreed, or conspired to suppress, fix, maintain or stabilize the prices of Treasury Securities, and by consequence the prices of U.S. Treasury Futures and options for U.S. Treasury Futures, in violation of the antitrust laws;

h.       whether Defendants' unlawful conduct caused injury to the business or property of Plaintiffs and the Class;

i.       whether Plaintiffs knew, or had any reason to know, of the conspiracy engaged in by Defendants;

j.       whether Defendants and their co-conspirators fraudulently concealed their misconduct from Plaintiffs and the members of the Class; and

k.       the appropriate class-wide measure of relief for the Defendants' violations of the CEA and antitrust laws.

155.       Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class.

156.       There is no conflict of interest between Plaintiffs and other members of the Class. Plaintiffs are represented by sophisticated class action counsel, experienced in complex antitrust and commodities futures manipulation litigation.  Defendants have acted in an unlawful manner on grounds generally applicable to all members of the Class.

157.    The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

158.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

159.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

160.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**VII.    The Discovery Rule and Fraudulent Concealment**

161.    During the Class Period, Defendants actively, fraudulently and effectively concealed their collusion and manipulation of Treasury auction yields and prices within the Treasury Security and Treasury Futures markets, as alleged herein, from Plaintiffs and members of the Class.

162.    By its very nature, the unlawful activity alleged herein was self-concealing. Defendants conspired to manipulate Treasury auction yields and prices within the Treasury

61

Security and Treasury Futures, to the benefit of Defendants and to the detriment of Plaintiffs and the members of the Class, and they further conspired to keep their collusive and manipulative conduct secret. As a result and as described herein, Plaintiffs could not, and thus did not, discover that they had suffered possible injury, at the earliest, prior to the June 2015 public reports of government investigations into the possibility of manipulation of Treasury auctions.

163. Reasonable due diligence could not have uncovered Defendants' and their co-conspirators' manipulative conspiracy because: (i) the Treasury Department auctions were held out as being set by an impartial auction based on market factors; (ii) Defendants' bids in the Treasury Department auctions are secret and not publicly available; (iii) Defendants' and their co-conspirators' trading positions and trading strategies in the when-issued market are not publicly available; (iv) the bilateral, non-exchange traded nature of when-issued market transactions makes observing anticompetitive and/or manipulative behavior in that market exceedingly difficult; (v) the highly specialized and esoteric nature of the different aspects of the Treasury Securities market makes it extraordinarily difficult for an ordinary person to assess improprieties and (vi) neither Defendants nor their co-conspirators told Plaintiffs or other Class members that they were conspiring to fix, stabilize, maintain and/or otherwise manipulate the prices of Treasury Securities during the when-issued market or at the auctions.

164. Defendants and their co-conspirators also took active steps to conceal evidence of their misconduct from Plaintiffs, the Class, regulators, and the public including, among other things: (i) holding out their activities in the when-issued market and at auction as good faith market-making conduct; (ii) maintaining the secrecy of their price-fixing scheme; (iii) avoiding any discussion in public of their collusive activities and manipulation of the when-issued market and Treasury Department auctions; and (iv) using non-public proprietary electronic

communication platforms (*e.g.*, instant messaging, electronic chatrooms, etc.) to coordinate trading strategies in the when-issued market and auction behavior.

165.    None of the facts or information available to Plaintiffs, or obtained through Plaintiffs' counsel's investigation and reasonable diligence, could or would have led to the discovery of the conspiracies and manipulation alleged in this Complaint.

166.    As a result, Plaintiffs were prevented from learning of the facts needed to commence suit against Defendants for the manipulative conduct alleged in this Complaint until Defendants and regulators publicly acknowledged their investigations and the scope thereof.

167.    The facts necessary for Plaintiffs to formulate the basis of a complaint and satisfy applicable pleading standards remained within the exclusive control of Defendants, their co-conspirators, and the governmental regulatory authorities investigating the activity alleged herein.

168.    Plaintiffs and the Class have acted diligently in seeking to bring their claims promptly.   Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiffs from suing them for the manipulative activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

**FIRST CLAIM FOR RELIEF**
**Manipulation of Treasury Futures Prices**
**in Violation of the Commodity Exchange Act**
**(7 U.S.C. § 1, *et seq.*)**
**(Against All Defendants)**

169.   Plaintiffs incorporate the allegations in this Complaint by reference and reallege them as though fully set forth herein.

170.   The CME is designated by the CFTC as a contract market pursuant to Section 5 of the CEA, 7 U.S.C. § 7.   The CME submits to the CFTC various rules and regulations for approval through which these exchanges design, create the terms of and conduct trading in Treasury Securities and Treasury Futures.   The CME is an organized, centralized market that provides a forum for trading on-exchange Treasury Futures.

171.   Defendants and their co-conspirators, through the acts alleged in this Complaint, specifically intended to and did cause unlawful and artificial manipulation of Treasury auction prices and understood and knew to a substantial certainty, as active and sophisticated Treasury market traders (*i.e.*, Primary Dealers), that manipulation of Treasury auction prices would have a direct corresponding manipulative effect on Treasury Futures prices and would cause corresponding actual damages to Plaintiffs and members of the Class.   Such consequences were thus fully and certainly foreseeable, and Defendants knowingly, intentionally and/or recklessly caused such harm and injury.   The acts of manipulation described in the complaint had no legitimate business purpose.

172.   Plaintiffs and others who transacted in Treasury Futures transacted at artificial and unlawful prices resulting from Defendants' manipulations in violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, and as a direct result thereof were injured and suffered damages.

173.    Defendants' conduct caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

174.    By their intentional misconduct, Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of Treasury Futures to be artificial.

175.    Defendants' activities alleged herein constitute market power manipulation of the prices of Treasury Securities and Treasury Futures in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).   Defendants' extensive manipulative conduct deprived Plaintiffs and other Class members of a lawfully operating market during the Class Period.

176.    Plaintiffs and Class members paid artificial prices for their Treasury Futures, were deprived of a lawfully operating market free from manipulation and are entitled to recover their actual damages resulting therefrom for the violations of the CEA alleged herein.

**SECOND CLAIM FOR RELIEF**
**Vicarious Liability for Manipulation of Treasury Futures Prices**
**in Violation of the Commodity Exchange Act**
**(7 U.S.C. § 2)**
**(Against All Defendants)**

177.    Plaintiffs incorporate the allegations in this Complaint by reference and reallege them as though fully set forth herein.

178.    Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them.

### THIRD CLAIM FOR RELIEF
### Aiding and Abetting in the Manipulation of Treasury Futures Prices
### in Violation of the Commodity Exchange Act
### (7 U.S.C. § 25)
### (Against All Defendants)

179.    Plaintiffs incorporate the allegations in this Complaint by reference and reallege them as though fully set forth herein.

180.    Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of other Defendants' manipulations of Treasury auction prices, and therefore of Treasury Futures prices, and willfully intended to assist these manipulations to cause the prices of Treasury Futures to be artificial, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1).

181.    Plaintiffs and the Class are each entitled to actual damages for the violations of the CEA alleged herein.

182.    As a further direct result of the acts of Defendants, Plaintiffs and the Class have been required to act in the protection of their interests by filing this action, and have incurred attorneys' fees and other expenditures, in a sum to be proven at trial.

### FOURTH CLAIM FOR RELIEF
### Manipulation by False Reporting and Fraud and Deceit In Violation
### of the Commodity Exchange Act, as Amended,
### (7 U.S.C. §§ 1, *et seq.* and Rule 180.1(a))
### (Against All Defendants)

183.    Plaintiffs incorporate the allegations in this Complaint by reference and reallege them as though fully set forth herein.

184.    By their intentional and reckless misconduct, Defendants each violated Section 6(c)(1) of the CEA, as amended, 7 U.S.C. § 9, and caused prices of exchange-traded Treasury Futures, and the prices of commodities underlying these instruments, to be artificial during the Class Period.  Defendants delivered and caused to be delivered for transmission through the

66

mails and interstate commerce, by multiple means of communication, including communications to electronic trading platforms, false or misleading or inaccurate reports concerning order and trade information that affect or tend to affect the price of Treasury Futures, which are commodities in interstate commerce, knowing, or acting in reckless disregard of, the fact that such report was false, misleading or inaccurate.

185.    Under Section 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. § 9, and Section 22 of the CEA, as amended, 7 U.S.C. § 25, it is unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC, which shall promulgate by not later than 1 year after July 21, 2010.

186.    In July 2011, the CFTC promulgated Rule 180.1(a), 17 C.F.R. § 180.1(a) (2011), which provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud, make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading.

187.    Unlawful manipulation under the CEA, as amended, and Rule 180.1 includes delivering, or causing to be delivered for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning market information or conditions that affect or tend to affect the price of any

commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

188. During the Class Period, Defendants used or employed manipulative or deceptive devices or contrivances, in connection with a contract of sale or purchase of commodities in interstate commerce. This conduct included the making of untrue or misleading statements of material facts, or omitting material facts necessary to make the statements made not misleading, such as:

a. Making untrue or misleading statements to influence Treasury auction prices;

b. Failing to disclose, and omitting, that they entered transactions to move prices in a direction to benefit their own trading books;

c. Failing to disclose, and omitting, that they were unlawfully conspiring between and among themselves to manipulate, *inter alia*, Treasury auction and Futures prices;

d. Issuing statements and directly engaging in the acts alleged herein knowingly or with reckless disregard for the truth; and

Defendants also employed various other deceptive devices as described above.

189. Defendants' conduct caused injury to Plaintiffs and other members of the Class who transacted in an artificial and manipulated market, at manipulated prices, and with artificial price trends, during the Class Period.

190. Plaintiffs and the other members of the Class are each entitled to damages for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF
### Contract Combination or Conspiracy to Manipulate
### Prices in Violation of Section 1 of the Sherman Act
### and Section 4 of the Clayton Act
### (15 U.S.C. § 1; 15 U.S.C. § 15)
### (Against All Defendants)

191.    Plaintiffs incorporate the allegations in this Complaint by reference and reallege them as though fully set forth herein.

192.    Defendants and their un-named co-conspirators entered into a contract, combination or conspiracy in restraint of trade, *i.e.*, to manipulate or fix prices of Treasury auctions, during the Class Period in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

193.    During the Class Period, Defendants possessed market power in the setting of Treasury Securities and Treasury Instruments, including Treasury Futures.

194.    The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed and/or manipulated Treasury auction prices, and as a result, the price of Treasury Securities and Treasury Futures. Thus, both Defendants' conduct (agreed coordinated action to fix Treasury auction prices, thus diminishing the independent competitive action that competition assumes and demands) and the intended and actual effect of that conduct (to raise the yields of the Treasuries above competitive levels and subsequently sell the Treasuries at lower yields) was anticompetitive. As such, Defendants' conspiracy is a per se violation of the federal antitrust laws and an unreasonable and unlawful restraint of trade.

195.    Each of the Defendants acted, as alleged herein, intentionally and with full knowledge of the objective of each of their agreed and coordinated conduct to manipulate, peg, fix, inflate and/or suppress Treasury auction prices for their collective advantage. Additionally,

each of the Defendants acted, as alleged herein, with knowledge to a substantial certainty, as active and sophisticated Primary Dealers, that their manipulation of Treasury auction prices would have a direct and corresponding manipulative effect on Treasury Futures prices, and so each Defendant intended to manipulate, peg, fix, inflate and/or suppress not only Treasury Securities prices, but also Treasury Futures prices. Further, each Defendant knew to a substantial certainty that such anticompetitive manipulation and fixing of prices in the Treasury auctions would cause harm and injury to Treasury Futures market participants such as Plaintiffs and members of the Class. Such consequences were thus fully and certainly foreseeable, and Defendants knowingly, intentionally and/or recklessly caused such harm and injury.

196.    Treasury Futures are traded throughout the U.S. in interstate commerce and globally.

197.    During the Class Period, Defendants acted in interstate commerce within the U.S.

198.    Defendants' violations substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

199.    During the Class Period, Plaintiffs and members of the Class transacted in and/or held Treasury Futures at prices that were set and otherwise made artificial as a result of Defendants' unlawful acts.

200.    Defendants' contract, combination, and conspiracy unreasonably restrained trade and commerce, made artificial the prices of Treasury Securities and Treasury Futures and caused misleading signals to be sent to market participants.

201.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have suffered injury to their business or property. Plaintiffs and the Class are each entitled to treble damages for the Defendants' violations of the Sherman Act alleged

herein, and a permanent injunction restraining Defendants from engaging in additional anticompetitive conduct.

202.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(A)    For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiffs as the Class representatives and their counsel as Class counsel;

(B)    For a judgment awarding Plaintiffs and the Class actual damages for Defendants' violations of the CEA, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)    For a judgment awarding Plaintiffs and the Class actual damages for Defendants' violations of the Sherman Act, together with pre- and post-judgment interest at the maximum rate allowable by law;

(D)    For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

(E)    For an award to Plaintiffs and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(F)    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by a jury.

Dated: September 30, 2015
New York, New York

**KIRBY McINERNEY LLP**

By:   /s/ *David E. Kovel*
David E. Kovel
David A. Bishop
Lauren Wagner Pederson, Of Counsel
Thomas W. Elrod
825 Third Avenue, 16th Floor
New York, NY 10022
Telephone:  (212) 371-6600
Facsimile:  (212) 751-2540
Email: dkovel@kmllp.com
        dbishop@kmllp.com
        lpederson@kmllp.com
        telrod@kmllp.com

72